1

2

3

4

5

6

7

8                               UNITED STATES DISTRICT COURT

9                          FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    RANDOLPH M. DIAZ,                          No.  2:10-cv-1388 MCE KJN P

12                   Plaintiff,

13         v.                                     ORDER and

14    M. MARTEL, et al.,                          FINDINGS AND RECOMMENDATIONS

15                   Defendants.

16

17    I.  Introduction

18           Plaintiff is a state prisoner, incarcerated at Mule Creek State Prison, under the authority of

19    the California Department of Corrections and Rehabilitation.  Plaintiff proceeds in forma pauperis

20    and without counsel in this civil rights action filed pursuant to 42 U.S.C. § 1983, premised on

21    plaintiff's claims of deliberate indifference to his serious medical needs.  Pending before the court

22    is a motion for summary judgment filed by the sole remaining defendant, Dr. W. Hashimoto.  For

23    the reasons that follow, the court recommends that defendant's motion be granted.

24    II.  Background

25           This action proceeds on plaintiff's First Amended Complaint (FAC), filed on July 14,

26    2011.  (ECF No. 14.)  The FAC alleges that, on October 2, 2008, plaintiff was a passenger in

27    restraints in a medical transport van, which was transporting plaintiff to an outside medical

28    facility, when the van was rear-ended by another medical transport van.  Plaintiff alleges that, as a

result of this accident, he "sustained neck, back, shoulder injury pain and . . . frequent headaches [and] dizzy spells." (FAC at 3.) Plaintiff alleges that the medical treatment he received at MCSP "failed to remedy" his injuries. (Id.) Defendant Hashimoto was one of plaintiff's treating physicians and the doctor who interviewed plaintiff in connection with the First Level Review of plaintiff's pertinent administrative grievance. The FAC alleges that defendant Dr. Hashimoto was deliberately indifferent to plaintiff's serious medical needs by "downplay[ing] or disregard[ing]" plaintiff's complaints of pain and dizziness, and failing to provide "proper medical attention" and "adequate medical treatment." (Id. at 3, 5.) Plaintiff alleges that he continues to experience headaches and dizziness, and pain in his neck, back and shoulder. (Id. at 5.) Plaintiff seeks compensatory and punitive damages and proper medical treatment.

On February 29, 2012, this court found that the FAC failed to state a cognizable claim against former defendant Ram, the driver of the medical transport van in which plaintiff was a passenger, or former defendant Martel, former warden of MCSP. (See ECF Nos. 16, 20.) On January 30, 2013, this court dismissed former defendant Dr. Smith, due to plaintiff's failure to exhaust his administrative remedies as to Smith. (See ECF Nos. 30, 31.) The court also granted summary judgment in defendant Hashimoto's favor on plaintiff's state law negligence claims,[1] thus limiting this action to plaintiff's Eighth Amendment claims against defendant Hashimoto. (Id.)

III. Legal Standards

A. Legal Standards for Summary Judgment

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file,

---

[1] Plaintiff's state law negligence claims against defendant Hashimoto were dismissed due to plaintiff's failure to comply with the claim requirements of California's Victim Compensation and Government Claims Board. (See ECF No. 30 at 8-14.)

together with the affidavits, if any," which it believes demonstrate
the absence of a genuine issue of material fact.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting then-numbered Fed. R. Civ. P.
56(c).)  "Where the nonmoving party bears the burden of proof at trial, the moving party need
only prove that there is an absence of evidence to support the non-moving party's case."  *Nursing
Home Pension Fund, Local 144 v. Oracle Corp. (In re Oracle Corp. Sec. Litig.)*, 627 F.3d 376,
387 (9th Cir. 2010) (citing *Celotex*, 477 U.S. at 325); *see* also Fed. R. Civ. P. 56 Advisory
Committee Notes to 2010 Amendments (recognizing that "a party who does not have the trial
burden of production may rely on a showing that a party who does have the trial burden cannot
produce admissible evidence to carry its burden as to the fact").  Indeed, summary judgment
should be entered, after adequate time for discovery and upon motion, against a party who fails to
make a showing sufficient to establish the existence of an element essential to that party's case,
and on which that party will bear the burden of proof at trial.  *Celotex*, 477 U.S. at 322.  "[A]
complete failure of proof concerning an essential element of the nonmoving party's case
necessarily renders all other facts immaterial."  *Id.* at 323.

Consequently, if the moving party meets its initial responsibility, the burden then shifts to
the opposing party to establish that a genuine issue as to any material fact actually exists.  *See
Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).  In attempting to
establish the existence of such a factual dispute, the opposing party may not rely upon the
allegations or denials of its pleadings, but is required to tender evidence of specific facts in the
form of affidavits, and/or admissible discovery material in support of its contention that such a
dispute exists.  *See* Fed. R. Civ. P. 56(c); *Matsushita*, 475 U.S. at 586 n.11.  The opposing party
must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome
of the suit under the governing law, *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248
(1986); *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.
1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return
a verdict for the nonmoving party, *see Wool v. Tandem Computers, Inc.*, 818 F.2d 1433, 1436
(9th Cir. 1987).

1    In the endeavor to establish the existence of a factual dispute, the opposing party need not

2    establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

3    dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

4    trial." T.W. Elec. Serv., 809 F.2d at 630.  Thus, the "purpose of summary judgment is to 'pierce

5    the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

6    Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) Advisory Committee's Note to 1963

7    Amendments).

8        In resolving a summary judgment motion, the court examines the pleadings, depositions,

9    answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R.

10   Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at

11   255.  All reasonable inferences that may be drawn from the facts placed before the court must be

12   drawn in favor of the opposing party.  Matsushita, 475 U.S. at 587.  Nevertheless, inferences are

13   not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate

14   from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224,

15   1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a

16   genuine issue, the opposing party "must do more than simply show that there is some

17   metaphysical doubt as to the material facts. . . . Where the record taken as a whole could not lead

18   a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'"

19   Matsushita, 475 U.S. at 586 (citation omitted).

20       Plaintiff was advised of the requirements for opposing a motion for summary judgment.

21   (See ECF No. 36-1.)  See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc);

22   Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

23       B.  Legal Standards for Deliberate Indifference to Serious Medical Needs

24       "[D]eliberate indifference to serious medical needs of prisoners constitutes the

25   unnecessary and wanton infliction of pain, proscribed by the Eighth Amendment.  This is true

26   whether the indifference is manifested by prison doctors in their response to the prisoner's needs

27   or by prison guards in intentionally denying or delaying access to medical care or intentionally

28   interfering with the treatment once prescribed."  Estelle v. Gamble, 429 U.S. 97, 104-05 (1976)

4

1    (internal citations, punctuation and quotation marks omitted).  "Prison officials are deliberately

2    indifferent to a prisoner's serious medical needs when they 'deny, delay or intentionally interfere

3    with medical treatment.'"  Wood v. Housewright, 900 F.2d 1332, 1334 (9th Cir. 1990) (quoting

4    Hutchinson v. United States, 838 F.2d 390, 394 (9th Cir. 1988)).

5         "A 'serious' medical need exists if the failure to treat a prisoner's condition could result in

6    further significant injury or the 'unnecessary and wanton infliction of pain.'"  McGuckin v.

7    Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies v.

8    Miller, 104 F.3d 1133 (9th Cir. 1997) (en banc) (quoting Estelle, 429 U.S. at 104).  Serious

9    medical needs include "[t]he existence of an injury that a reasonable doctor or patient would find

10   important and worthy of comment or treatment; the presence of a medical condition that

11   significantly affects an individual's daily activities; [and] the existence of chronic and substantial

12   pain."  McGuckin, 974 F.2d at 1059-60.

13        To prevail on a claim for deliberate indifference to serious medical needs, a prisoner must

14   demonstrate that a prison official "kn[ew] of and disregard[ed] an excessive risk to inmate health

15   or safety; the official must both be aware of the facts from which the inference could be drawn

16   that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer v.

17   Brennan, 511 U.S. 825, 837 (1994).

18        "In the Ninth Circuit, the test for deliberate indifference consists of two parts.  First, the

19   plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's

20   condition could result in further significant injury or the unnecessary and wanton infliction of

21   pain.  Second, the plaintiff must show the defendant's response to the need was deliberately

22   indifferent.  This second prong . . . is satisfied by showing (a) a purposeful act or failure to

23   respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."

24   Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006) (internal citations, punctuation and quotation

25   marks omitted); accord, Wilhelm v. Rotman, 680 F.3d 1113, 1122 (9th Cir. 2012); Lemire v.

26   CDCR, 726 F.3d 1062, 1081 (9th Cir. 2013).

27        "The indifference to a prisoner's medical needs must be substantial.  Mere 'indifference,'

28   'negligence,' or 'medical malpractice' will not support this claim.  Even gross negligence is

5

insufficient to establish deliberate indifference to serious medical needs."  Lemire, 726 F.3d at 1081-82 (internal citations, punctuation and quotation marks omitted); accord, Cano v. Taylor, 739 F.3d 1214, 1217 (9th Cir. 2014).  Moreover, "[a] difference of opinion between a physician and the prisoner -- or between medical professionals -- concerning what medical care is appropriate does not amount to deliberate indifference."  Snow v. McDaniel, 681 F.3d 978, 987 (9th Cir. 2012) (citing Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir. 1989)).

Whether a defendant had requisite knowledge of a substantial risk of harm is a question of fact.  "[A] factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.  The inference of knowledge from an obvious risk has been described by the Supreme Court as a rebuttable presumption, and thus prison officials bear the burden of proving ignorance of an obvious risk. . . . [D]efendants cannot escape liability by virtue of their having turned a blind eye to facts or inferences strongly suspected to be true . . . ."  Coleman v. Wilson, 912 F. Supp. 1282, 1316 (E.D. Cal. 1995) (citing Farmer, 511 U.S. at 842-43) (internal quotation marks omitted).

When the risk is not obvious, the requisite knowledge may still be inferred by evidence showing that the defendant refused to verify underlying facts or declined to confirm inferences that he strongly suspected to be true.  Farmer, 511 U.S. at 842.  On the other hand, prisons officials may avoid liability by demonstrating "that they did not know of the underlying facts indicating a sufficiently substantial danger and that they were therefore unaware of a danger, or that they knew the underlying facts but believed (albeit unsoundly) that the risk to which the facts gave rise was insubstantial or nonexistent."  Id. at 844.  Thus, liability may be avoided by presenting evidence that the defendant lacked knowledge of the risk and/or that his response was reasonable in light of all the circumstances.  Id. at 844-45; see also Wilson v. Seiter, 501 U.S. 294, 298 (1991); Thomas v. Ponder, 611 F.3d 1144, 1150-51 (9th Cir. 2010).

IV.  Defendants' Objections to Plaintiff's Evidence and Motion to Strike

Defendant moves to strike several of plaintiff's statements in opposition to the motion for summary judgment, as medical and/or legal opinions that plaintiff is unqualified to give (citing Fed. R. Evid. 701-703), and/or because the content of the statements is allegedly irrelevant (citing

6

1    Fed. R. Evid. 401).  (See ECF No. 42; see also ECF No. 41 at 2.)  In addition, defendant asserts

2    that plaintiff has failed to comply with the following protocol for opposing a motion for summary

3    judgment:  (1) to reproduce defendant's Statement of Undisputed Facts, admit those facts that are

4    undisputed, and deny those facts that are disputed, with citations to the record; and (2) to file an

5    optional Statement of Disputed Facts, with appropriate citations (citing Fed. R. Civ. P. 56, and

6    E.D. Cal. L. R. 260).  On this basis, defendant asks the court to exercise its discretion to find that

7    each of defendant's undisputed facts is undisputed, Fed. R. Civ. P. 56(e)(2), and to grant

8    summary judgment to defendant, Fed. R. Civ. P. 56(e)(3).

9            The Ninth Circuit has "held consistently that courts should construe liberally motion

10   papers and pleadings filed by pro se inmates and should avoid applying summary judgment rules

11   strictly." Thomas v. Ponder, 611 F.3d 1144, 1150 (9th Cir. 2010) (citation omitted).  It is an

12   abuse of discretion to refuse to consider evidence offered by a pro se plaintiff at the summary

13   judgment stage based only on technical requirements.  See Jones v. Blanas, 393 F.3d 918, 935

14   (9th Cir. 2004) (reversing and remanding with instructions to consider evidence offered by pro se

15   plaintiff in his objections to findings and recommendations on summary judgment).  Moreover,

16   the court has based its findings and recommendations only on evidence that would be admissible

17   in proper form at trial.  Therefore, defendant's objections are overruled, and defendant's motion

18   to strike is denied.

19   V.  Undisputed Facts

20           The following facts are undisputed by the parties or, following the court's review of the

21   record, have been deemed undisputed for purposes of the pending motion.

22           1.  At all times relevant to this action, plaintiff Randolph Diaz was an inmate in the

23   custody of the California Department of Corrections and Rehabilitation (CDCR), incarcerated at

24   Mule Creek State Prison (MCSP), in Ione, California, where he was assigned to the Chronic Care

25   Program (CCP).[2]  Plaintiff was born in 1953.

26   _____

27   [2] The purpose of the Chronic Care Program, within the California Prison Health Care Services
     (CPHCS), is to ensure that patient-inmates with chronic health conditions are screened, identified
28   and treated; receive appropriate follow up and continuity of care; are provided with approved
     treatment guidelines for the treatment of specific chronic disease; and receive health care

2.  At all times relevant to this action, defendant Dr. Hashimoto was a physician and surgeon employed by CDCR, who worked at MCSP.

3.  On October 2, 2008, plaintiff was a passenger in restraints in a medical transport van, when the van was rear-ended by another medical transport van.

4.  Dr. Hashimoto was not part of the medical staff that provided plaintiff with evaluation and treatment immediately after the accident.  Dr. Hashimoto first treated plaintiff on April 3, 2009, and last treated plaintiff on August 24, 2010.  (Hashimoto Decl. at ¶ 9, 11.)

5.  Immediately following the accident, at 10:30 a.m. on the same day, plaintiff was initially examined by a Registered Nurse (RN), in MCSP's Treatment and Triage Area (TTA). Plaintiff described "bumping [his] back and neck" when the accident occurred, and stated that the pain level in his back and neck was a "6" (on an ascending scale from 0 to 10).  The RN noted that plaintiff had a steady gait when he walked to the TTA.  A Health Care Services Request Form was completed, and plaintiff agreed to return to his cell.  (Heatley Decl. at ¶ 11; Hashimoto Decl. at ¶ 12; Heath Decl., Ex. D at 6; Oppo. at 7.)

6.  Later the same day, at 6:10 p.m., plaintiff had another medical appointment with an RN.  Plaintiff stated that he was taking regularly prescribed ibuprofen, but it wasn't helping; and that his symptoms were worse, including increased neck pain progressing to his mid-lumbar region.  Range of motion tests caused increased pain.  Plaintiff was able to twist slowly to the right, to 20 degrees with painful progression, and twist upright to the left to 30 or more degrees before feeling painful progression.  Pursuant to a telephone consultation with the on-call physician, the RN administered an intramuscular injection of Toradol 60 mg (an analgesic and anti-inflammation medication), and advised plaintiff to refrain from twisting or aggressive movements, and to follow-up with the yard doctors.  (Heatley Decl. at ¶ 11; Hashimoto Decl. at ¶ 12; Heath Decl., Ex. D at 7-9; Oppo. at 8.)

////

---

education, counseling, and targeted goal-setting for practicing healthy behaviors, managing their own chronic illness, and improving their health outcomes and quality of life.  CPHCS Inmate Medical Services Policies & Procedures, Vol. 7, Ch. 1A.

7.  Prior to the October 2, 2008, accident, plaintiff's medical care included treatment for arthritic pain in his hands and back, which he described as mild, and for which he was prescribed acetaminophen or ibuprofen and exercise.  (Heatley Decl. at ¶ 10, Ex. D at 2.)

8.  Plaintiff was next seen by a physician on November 5, 2008, pursuant to a thirty-day follow-up appointment related to his cardiac issues (mitral valve regurgitation).  Plaintiff complained of dizziness and back pain related to the motor vehicle accident, and stated that his pain medications did not relieve his pain.  The physician noted in pertinent part that plaintiff had a history of cervical spinal degenerative disease with 2 degree foraminal narrowing.  However, the physician noted that plaintiff did not appear to be in current distress.  (Heath Decl., Ex. D at 11.)

9.  On December 11, 2008, plaintiff obtained x-rays of his thoracic and lumbar spine.  The radiologist made the following findings (Heath Decl., Ex. D at 14; Oppo. at 30):

> **Thoracic spine**:  Frontal and lateral views show vertebral body heights to be maintained.  Interspaces appear normal.  No paraspinal masses are seen.
> **Impression**:  Normal thoracic spine.
>
> **Lumbar spine**:  AP, lateral and both oblique views show trace anterior spurring at lumbar levels 3, 4, and 5. The interspaces appear maintained.  The vertebral body heights appear normal.  No other abnormalities are seen.
> **Impression**:  Trace anterolateral osteoarthritic spurring without evidence of interspace narrowing or vertebral height reduction.

10.  Also on December 11, 2008, plaintiff received a thirty-day specialty consult for his cardiac issues.  Plaintiff complained of mid/low back pain (without radiation or numbness) related to the motor vehicle accident.  The physician noted that plaintiff had full range of motion of his extremities.  (Heath Decl., Ex. D at 12.)

11.  On January 27, 2009, plaintiff received a thirty-day follow-up appointment.  In addition to his cardiac issues, plaintiff complained of chronic low back pain, localized to the lumbosacral area, with occasional spasms, worsening with activity or prolonged sitting.  Plaintiff stated that he felt OK the day of the appointment.  (Heath Decl., Ex. D at 16.)

12.  **On April 3, 2009, Dr. Hashimoto examined plaintiff for the first time.**  In addition to noting plaintiff's cardiac symptoms for which plaintiff was awaiting a surgical consult, Dr.

9

Hashimoto noted plaintiff's complaints of chronic low back pain and dizziness.  However, Dr. Hashimoto noted that plaintiff's "mechanical" back symptoms were improving, as were his dizzy spells.  Upon exam, plaintiff's lumbosacral spine showed full range of motion, negative for straight leg lifts, and plaintiff showed normal gait and reflexes.  Plaintiff told Dr. Hashimoto that he was walking one to two laps per day, which Dr. Hashimoto characterized as good function. Dr. Hashimoto instructed Diaz on appropriate exercises and stretching.  (Hashimoto Decl. at ¶ 15; Heath Decl., Ex. D at 17-9; Oppo. at 14.)

13.  On April 17, 2009, plaintiff was examined by a chronic care RN who noted plaintiff's complaints of chronic back and neck pain since his motor vehicle accident.  The RN also noted that plaintiff walked with a steady, stable gait without apparent distress.  (Heath Decl., Ex. D at 20-21.)

14.  Plaintiff was prescribed Vicodin following his May 6, 2009 mitral valve repair, which was refilled for periods of three and six weeks.  (Heath Decl., Ex. D at 22, 26.)  Plaintiff was also regularly prescribed acetaminophen and ibuprofen.  (Id. at 26.)

15.  On May 26, 2009, Dr. Hashimoto had a cardiac follow-up appointment with plaintiff. Dr. Hashimoto ordered a lay-in and cell feeding for one month and an additional follow-up appointment.  (Heatley Decl. at ¶ 17; Heath Decl., Ex. D at 23-6.)

16.  On June 29, 2009, Dr. Hashimoto examined plaintiff at another regular follow-up appointment.  The only pertinent notation is that plaintiff stated he was able to walk one to one-and-a-half-laps per day.  Dr. Hashimoto refilled plaintiff's prescription for Vicodin, in addition to plaintiff's prescriptions for ibuprofen and acetaminophen.  Dr. Hashimoto ordered a six-month accommodation chrono for a lower bunk and instructions not to lift more than 25 pounds, based on plaintiff's cardiac recovery.  (Heatley Decl. at ¶ 18; Hashimoto Decl. at ¶ 16; Heath Decl., Ex. D at 22, 27-30.)

17.  On July 3, 2009, Physician's Assistant (PA) Fortune examined plaintiff in response to his complaints of dizziness, and neck and back pain for the past ten months.  Plaintiff stated that his pain level was usually around a level "2 or 3," but was sometimes an "8," and that he had dizziness about every two weeks.  The PA reviewed plaintiff's December 2008 x-ray report, and

10

examined plaintiff, finding mild tenderness in plaintiff's neck at the base of his skull, with an 80% range of motion and no other limits.  Plaintiff's back was tender in the mid-lumbar region with 75% range of motion in all directions.  Straight leg raises were designated a +1 in both legs. The PA found no neurological deficits.  He continued plaintiff's medications, and recommended physical therapy after plaintiff was cleared by cardiology.  (Heath Decl., Ex. D at 31-2; Oppo. at 9.)

18.  On July 30, 2009, Dr. Hashimoto examined plaintiff at a follow-up appointment for his mitral valve repair and for spider bites.  Plaintiff complained of neck and lower back pain, with "good and bad days," and right shoulder pain.  On examination, plaintiff exhibited mild to moderate pain with abduction at 90 degrees and a positive Hawkins and Neer test.  Dr. Hashimoto diagnosed right shoulder tendinitis, and chronic neck and low back pain.  He prescribed Motrin 600 mg, and range of motion exercises, and scheduled a follow-up in two-to-four weeks. (Hashimoto Decl. at ¶ 17 Heath Decl., Ex. D at 33-6; Oppo. at 10.)

19.  On August 2, 2009, plaintiff filed an administrative grievance on an Inmate/Parolee Appeal Form CDC 602, Log No. MCSP-16-09-12270.  (See FAC at 8-16, 16-7; Altschuler Decl., Exhs. A, B.)  Plaintiff stated therein that he had previously submitted a Health Care Appeal that was returned on June 25, 2009.[3]  The grievance states that plaintiff's "visits to the Doctor have rendered no helpful solutions."  Plaintiff requested that he "receive an effective adequate pain management program [until] the source of my back [and] neck [pain] and dizzy spells can be properly remedied."  (FAC at 2, 8-11; Altschuler Decl. at ¶ 9, Ex. A; Hashimoto Decl. at ¶18.)

20.  On September 9, 2009, Dr. Hashimoto interviewed plaintiff at the First Level regarding his administrative grievance, and noted that "Pt. wants meds for back/neck pain [stating] 'I was seen and nothing is done.'"  Plaintiff complained of back and neck pain with some bad days, but stated that he was usually okay.  He complained of ongoing right shoulder pain with certain movements.  Dr. Hashimoto reviewed plaintiff's medical chart and found that his care was appropriate to date.  Plaintiff stated that Motrin was unhelpful, so Dr. Hashimoto

---

[3] The Health Care Appeals Coordinator directed plaintiff to submit a CDCR Health Care Services Request Form 7362.  (FAC at 13.)  However, plaintiff submitted a Form 602.

1    discontinued the Motrin and prescribed a Naproxen, 500 mg two times per day.  Dr. Hashimoto

2    reviewed the sick call system with plaintiff so that he could request additional medical care as

3    needed, and noted that plaintiff had a regular CCP follow-up appointment in one month.

4    (Hashimoto Decl. at ¶¶19-20; Altschuler Decl. at ¶ 9, Ex. A.)  Plaintiff's grievance was partially

5    granted at the Second Level, based on the finding that plaintiff's care was appropriate.[4]

6        21.  On November 6, 2009, Dr. Hashimoto conducted a 60-day follow-up of plaintiff for

7    his mitral valve repair.  Plaintiff stated in pertinent part that, for the past year, he experienced

8    occasional dizziness, and chronic right shoulder tendinitis with pain on certain movements.  Dr.

9    Hashimoto discussed physical therapy and cortisone injections for plaintiff's shoulder, and

10   plaintiff stated that he wanted an injection.  Dr. Hashimoto also noted plaintiff's episodic

11   mechanical back pain, and chronic but stable neck pain, and stated that plaintiff was generally

12   "doing ok, function good."  Dr. Hashimoto prescribed Meclizine 25 mg three times a day to treat

13   plaintiff's dizziness.  (Hashimoto Decl. at ¶ 21; Heatley Decl. at ¶ 22; Heath Decl., Ex. D at 39-

14   42; Oppo. at 11-2.)

15       22.  On December 11, 2009, Dr. Hashimoto conducted a follow-up exam of plaintiff's

16   right shoulder and noted that the symptoms were unchanged.  Plaintiff was given an injection of

17   1/2 ml Kenalog and 1 ml Marcaine, instructed to engage in light activity, and scheduled for a

18   follow-up.  (Heatley Decl. at ¶23; Hashimoto Decl. at ¶ 22; Heath Decl., Ex. D at 43-4; Oppo. at

19   13.)

20       23.  Plaintiff was next seen at a CCP follow-up appointment on February 22, 2010, by PA

21   Akintola.  Plaintiff's mitral valve repair appeared to be successful.  Plaintiff complained in

22   pertinent part that he continued to experience shoulder pain, since the 2008 motor vehicle

23   accident, even after receiving the December 2009 injection.  Plaintiff requested a lower bunk

24   chrono.  The PA recommended, as approved by Dr. Hashimoto, that plaintiff obtain x-rays of his

25

26   [4]  It appears that plaintiff did not pursue Third (Director's) Level Review of his grievance;
     however, no defendant sought judgment in this case on that basis.  "Failure to exhaust under the
27   PLRA [Prison Litigation Reform Act] is 'an affirmative defense the defendant must plead and
     prove.'"  Albino v. Baca, 747 F.3d 1162, 1166 (9th Cir. 2014) (quoting Jones v. Bock, 549 U.S.
28   199, 204, 216 (2007)).

shoulder to rule out a rotator cuff tear.  (Heatley Decl. at ¶ 24; Hashimoto Decl. at ¶ 23; Heath Decl., Ex. D at 45-6; Oppo. at 19.)  The radiologist reviewing the February 24, 2010 x-rays found that plaintiff had a "normal right shoulder."  (Oppo. at 32.)

24.  On April 13, 2010, plaintiff sought health care services for his continuing shoulder pain.  He was seen by PA Akintola, who noted that plaintiff's February 24, 2010 x-rays of his right shoulder were normal.  The PA submitted a health care request for an MRI, approved by a physician (name undecipherable), but it was denied on May 6, 2010, by Dr. C. Smith, Chief Physician and Surgeon with the Medical Authorization and Review Committee, who referred plaintiff to physical therapy.  (Heatley Decl. at ¶ 25; Heath Decl., Ex. D at 47-48; Oppo. at 29, 31.)

25.  On May 23, 2010, plaintiff came to the clinic stating, "I am dizzy, my speech is leaving, I can't stand."  Plaintiff returned to his building after about an hour.  The next day, on May 24, 2010, plaintiff was examined by PA Akintola.  Plaintiff stated that he went to the clinic the day before because, while walking around the yard, he began sweating profusely, slurring his speech, and became dizzy.  Plaintiff felt better the next day, but stated that he had experienced dizzy spells since his 2008 accident.  PA Akintola noted that plaintiff had a history of cervical degeneration with foraminal narrowing.  The PA ordered laboratory tests and an EKG.  (Hashimoto Decl. at ¶ 24; Heatley Decl. at ¶ 26; Heath Decl., Ex. D at 49-51; Oppo. at 16-7.)

26.  On June 9, 2010, plaintiff was seen at a follow-up appointment for his dizziness by PA Carter, in consultation with Dr. S. Heatley.  Plaintiff complained of intermittent dizziness/vertigo since the 2008 accident, occurring randomly.  He stated that the episodes lasted from 20 minutes to an hour and a half, worse with movement, and that lying down helped.  He stated that the episodes were usually over by the time he took the Meclizine.  PA Carter provisionally diagnosed benign positional vertigo, showed plaintiff the Epley maneuver, and prescribed additional Meclizine.  Plaintiff was scheduled for a follow-up appointment and instructed to return if his symptoms worsened.  (Heatley Decl. at ¶ 27; Heath Decl., Ex. D at 52-3; Oppo. at 15.)

////

27.  On June 29, 2010, plaintiff had a follow-up appointment for his right shoulder pain, dizziness, and mitral valve repair, with Dr. R. Hawkins.  The exam revealed no indications of musculoskeletal issues and plaintiff appeared to be doing well physically.  A lower bunk chrono was denied because deemed not medically necessary.  It was recommended that plaintiff continue his current protocol concerning his vertigo, and remain indoors when temperatures were above ninety degrees.  (Heatley Decl. at ¶ 28; Heath Decl., Ex. D at 54.)

28.  On August 24, 2010, Dr. Hashimoto examined plaintiff for his chronic dizziness.  Dr. Hashimoto found plaintiff's gait and neurological examination were normal.  Dr. Hashimoto reviewed plaintiff's laboratory test results and EKG, and determined that plaintiff's dizziness was not caused by a cardiac episode or stroke.  **This was the last time that plaintiff was seen by Dr. Hashimoto.**  (Hashimoto Decl. at ¶ 25; Heatley Decl. at ¶ 29; Heath Decl., Ex. D at 51.)

29.  On September 8, 2010, plaintiff's medications were reviewed by medical staff, who noted in pertinent part that plaintiff's conditions were unchanged, and that plaintiff walked and talked without difficulty.  Plaintiff stated that Naproxen was not needed and Tylenol worked better.  (Heatley Decl. at ¶30; Heath Decl., Ex. D at 55.)

30.  On November 23, 2010, plaintiff was seen by PA Todd pursuant to a regular CCP follow-up appointment, without any extraordinary findings or recommendations.  (Heath Decl. Ex., D at 56.)

31.  On April 20, 2011, Dr. Hawkins saw plaintiff in response to his concerns that his medications were not being regularly refilled.  Dr. Hawkins noted that plaintiff "denie[d] any symptoms today," and refilled all of plaintiff's medications.  A follow-up appointment was scheduled for 120 days.  (Heatley Decl. at ¶ 31; Heath Decl., Ex. D at 57.)

32.  On June 8, 2011, RN Olson examined plaintiff for complaints of low back pain.  Plaintiff stated that he had increased symptoms the past three months, with a pain level of "6."  Plaintiff's gait was normal.  The nurse prescribed ibuprofen and instructed plaintiff to return if his symptoms persisted or grew worse.  (Heatley Decl. at ¶ 32; Heath Decl. Ex. D at 58-9; Oppo. at 36.)

////

33. On June 29, 2011, plaintiff's medications were again reviewed and refilled by medical staff, who noted that plaintiff's chronic symptoms had improved some. (Heatley Decl. at ¶ 33; Heath Decl., Ex. D at 60.)

34. On July 21, 2011, plaintiff was examined by Dr. Hawkins in response to plaintiff's request for a renewal of his temporary lower bunk chrono, which expired on October 22, 2010. Dr. Hawkins denied the request, and discontinued plaintiff's prescription for Meclizine based on his finding of "no medical necessity.  No change in physical response."  Dr. Hawkins advised plaintiff to follow a proper diet, exercise, and lose 10 pounds.  (Heatley Dec. at ¶ 34; Heath Decl., Ex. D at 61-2.)

35. On August 18, 2011, plaintiff again requested a lower bunk chrono, which was denied by Dr. Hawkins.  Dr. Hawkins ordered x-rays to assess plaintiff's cervical and lumbosacral degenerative disease.  (Heatley Decl. at ¶ 35; Heath Decl., Ex. D at 63-6.)

36. On August 23, 2011, plaintiff had x-rays of his lumbar spine.  The findings of the radiology report were as follows (Heath Decl., Ex. D at 66; Oppo. at 34):

> **Findings**: . . . There is no spondylolisthesis identified.  A mild posterior subluxation of L3 upon L4 is identified.  The disc space at L3-4 appears to be mildly narrowed.  Disc space at L5-6 is also mildly narrowed.  These are small ventral spurs identified at all levels.  The pedicles and spinous processes appear to be intact.  Sacroiliac joints are normal.
>
> **Impression:**
> 1. Slight posterior subluxation of L3 upon L4.
> 2. Mild disc space narrowing present at L3-4 and L5-S1.
> 3. No definite fracture is seen.

37. Also on August 23, 2011, plaintiff had x-rays of his cervical spine.[5]  The findings of the radiology report were as follows (Oppo. at 35):

---

[5] The only submitted objective evidence concerning plaintiff's cervical condition is this report of his August 23, 2011 x-rays, which showed degenerative disc disease at C3-4 and C6-7.  However, as recounted above, the available medical record references such findings.  On November 5, 2008, a month after plaintiff's accident, the unidentified attending physician noted that plaintiff had a history of cervical spinal degenerative disease with 2 degree foraminal narrowing.  (Heath Decl., Ex. D at 11.)  The second reference was made by PA Akintola, on May 24, 2010, who noted that plaintiff had cervical degeneration with forminal narrowing.  (Id. at 51.)

**Findings**: . . . No acute fractures are seen.  The disc space at the level of C3-4 is mild to moderately narrowed.  There is mild narrowing present at the level of C6-7.  The rest of the discs are normal height.  There are small ventral spurs identified at all levels.  This is greatest at the levels of C5 and C6.  Prevertebral structures are normal.  On the AP view, there are facet degenerative changes identified bilaterally at the level of C4-5, greater on the left side.

**Impression:**
1. No definite fractures are seen.
2. Degenerative disc disease identified primarily at C3-4 and also at C6-7.

38.  On September 23, 2011, Dr. Hawkins explained the x-ray results to plaintiff and again denied plaintiff's request for a lower bunk chrono.  (Heath Decl., Ex. D at 65.)

39.  On October 5, 2013, plaintiff was seen by RN Goodgame for complaints of sharp lower back pain at a level "8," with spasm.  Plaintiff was observed to have a "slow stooped gait" and to be "slow to sit and stand."  The RN noted that plaintiff had a documented diagnosis of chronic low back pain; prescribed ibuprofen; and instructed plaintiff on body mechanics and exercise, and to submit a Health Care Services Request Form if his symptoms persisted or grew worse.  (Oppo. at 37-9.)

VI.  Additional Evidence

A.  Plaintiff's Requests for Medical Care

In opposition to the pending motion, and in addition to the evidence summarized above, plaintiff has submitted copies of several Health Care Services Request Forms pursuant to which he sought medical care for his pain and dizziness.  Only two of these requests were submitted within the time frame that included Dr. Hashimoto's care of plaintiff.[6]  These forms contain the

---

[6]  The other requests submitted by plaintiff are as follows (Oppo., Exh. B (ECF No. 40 at 21-7, 33)):

**June 6, 2011:**  "I have back pain."  Plaintiff was examined and treated by RN Olson on June 8, 2011, and his medications renewed.

**February 27, 2012:**  "Back pain."  Plaintiff was examined and treated by RN Santos on February 28, 2012.

**June 8, 2013:**  "I'm having bad back pains."  Plaintiff grew upset at the clinic, yelling that he never gets seen, and refused examination and treatment.

1 | following requests and responses (Oppo., Exh. B (ECF No. 40 at 21-7, 33)):

2
3
4

> **June 29, 2009:** "I have pain in my neck and mid to lower back with frequent dizzy spells." Plaintiff attributed his symptoms to the accident and requested "[a]ny help you can give me." Plaintiff was examined and treated by PA Fortune on July 3, 2009, and next seen by Dr. Hashimoto on July 30, 2009.

5
6
7
8
9

> **April 12, 2010:** "I need to talk with someone about my shoulder, the pain has increased to where it's hard to sleep." Plaintiff was examined and treated by PA Akintola on April 13, 2010. He was seen thereafter by PA Akintola on May 23, 2010; by PA Carter and Dr. Heatley on June 9, 2010; by Dr. Hawkins on June 29, 2010; and by Dr. Hashimoto on August 24, 2010 (his last medical visit with defendant).

10 | B.  Declaration of Dr. Hashimoto

11 | Defendant Dr. W. Hashimoto, M.D., filed a declaration in support of his motion for

12 | summary judgment.  (See ECF No. 36-4 (Hashimoto Decl.).)  Dr. Hashimoto earned his medical

13 | degree from St. Louis University in 1983.  He has been board certified in Internal Medicine since

14 | 1986, and licensed to practice in California since 1993.  Dr. Hashimoto was employed as a

15 | physician and surgeon at MCSP from August 2005 until December 2011, and now practices

16 | Occupational Medicine at Kaiser in South Sacramento.

17 | Dr. Hashimoto's declaration summarizes plaintiff's relevant medical care, recounts each

18 | appointment that plaintiff had with Dr. Hashimoto, and seeks to explain why Dr. Hashimoto

19 | responded as he did.  (See Hashimoto Decl., at ¶¶ 8-25.)  In conclusion, Dr. Hashimoto states (id.

20 | at ¶¶ 27-36):

21
22
23
24
25

> 27.  Based on my examinations and Mr. Diaz's medical records, Mr. Diaz had mechanical back pain that was benign and stable neck pain.  This means that he experienced pain with movement and there was no indication in his records or examinations that he suffered from any serious condition.  The type of low back condition he had is very common and considered part of the normal wear and tear of aging.  Overall, Mr. Diaz had good function when I examined him, and his back pain was only episodic and it showed improvement over time.  His neck pain was stable and also showed

26

27
28

> **October 4, 2013:** "My back is in extreme pain and I have no more pills for my pain.  'Please help me.'"  RN Goodgame examined and treated plaintiff on October 5, 2013.

17

improvement over time.   Mr. Diaz was able to function well, showed good range of motion, and he was able to exercise by walking laps around the track.

28.  Based on my examinations of Mr. Diaz's low back and neck pain, I determined the appropriate medical care included non-steroidal anti-inflammatory drugs (NSAIDS) or Tylenol, and regular exercise.  I also instructed him on proper exercises.  This course of treatment is consistent with [the] standard of care for the type of low back and neck pain Mr. Diaz experienced.

29.  Based on my examinations and Mr. Diaz's medical records, Mr. Diaz experienced benign dizziness.  This means that he would become dizzy when he moved, but he did not have any abnormal examinations and neurological and other exams did not show a serious condition and I ruled out any life threatening illnesses.  Mr. Diaz's dizziness was episodic and not persistent and typically did not last for prolonged periods.  It also improved over time.

30.  Based on my examinations and Mr. Diaz's medical records, I determined the appropriate medical care included the prescription of meclizine, which is the standard of care to treat this medical condition.  Range of motion exercises [were] also prescribed.  Mr. Diaz was also instructed on the Epley maneuver and to stay indoors on days when the temperature exceeded ninety degrees.   This course of treatment was consistent with the standard of care for Diaz's benign dizziness.

31.  Based on my examinations and Mr. Diaz's medical records, Mr. Diaz experienced pain in his shoulder.  Examinations and x-rays revealed no abnormal findings and that his shoulder improved over time.  Based on the examinations, I determined that the proper treatment at that time was a shoulder injection.  I also explained the injection versus physical therapy and Mr. Diaz opted for the injection.  I also prescribed light activity.  This course of treatment was consistent with the standard of care for the shoulder pain exhibited by Mr. Diaz at the time of my examinations.

32.   In addition to my treatment, Mr. Diaz was also examined eighteen times for his back and neck pain, and dizziness by other medical officials [listing dates from April 17, 2009 through February 13, 2012].

33.  The medical records for these visits show that Mr. Diaz was receiving continuous care for his medical conditions both before and after I provided him with care.  The overall care I prescribed was consistent with that prescribed by the other medical professional[s] that examined him.

34.  I exercised my training, experience, and medical judgment to provide Mr. Diaz with appropriate medical treatment for his medical conditions.  It is my professional opinion that Mr. Diaz was provided with proper, adequate, and professional medical care that was consistent with community standards.

18

35.  At no time did I ever knowingly or intentionally deny Mr. Diaz adequate medical care, nor have I ever knowingly or intentionally sought to deny Dr. Diaz access to medical treatment.  I have never knowingly or intentionally disregarded any risk of harm or injury to Mr. Diaz and I never interfered with treatment prescribed by other physicians.  I was always responsive to Mr. Diaz's requests for medical care and provided him with appropriate care based on medical data.

36.  I performed my duties to the best of my ability and in compliance with all appropriate CDCR procedures and regulations. I was, at all times, motivated by a genuine concern for Mr. Diaz's health and well-being.

C.  Declaration of Dr. Heatley

Dr. S. Heatley, M.D., Ph.D., is the Chief Medical Executive for MCSP, and held that position at all times relevant to this action.  Dr. Heatley completed his medical degree and residency at Stanford, and is board certified in Internal Medicine.  Dr. Heatley's declaration is based on his thirty years of professional experience, training and knowledge, his review of plaintiff's pertinent medical records, and his assessment when treating plaintiff on one occasion, on June 9, 2010.  (ECF No. 36-6 (Heatley Decl.).)

In addition to reviewing the specifics of plaintiff's medical care (see Heatley Decl. at ¶¶ 6-38, 44), and the respective standards of care for treating dizziness, shoulder pain/tendinitis, and arthritis/degenerative joint disease (id. at ¶¶ 41-43), Dr. Heatley offered the following medical opinions (id. at ¶¶ 39-44):

39.  Based upon my review of the medical records documenting Mr. Diaz's encounters with healthcare providers between 2008 and early 2012, and my training and experience, it is my opinion that Mr. Diaz received continual medical care for his back and neck pain, shoulder pain, and dizziness, and the care he received was necessary and appropriate for the symptoms he exhibited and met the standard of care for treating those conditions.

40.  Specifically, the medical care that Mr. Diaz received from Dr. Hashimoto was medically necessary and appropriate.  Dr. Hashimoto provided a series of examinations of Mr. Diaz when he reported with back, neck, and shoulder pain, and dizziness, and he ordered followup examinations.  Dr. Hashimoto also ordered a series of treatments for Mr. Diaz based on the examinations and symptoms he exhibited.  The different treatments prescribed to Mr. Diaz for the type of back and neck pain, shoulder pain, and dizziness that he exhibited during Dr. Hashimoto's examinations

19

were consistent with the standard of care and the treatment prescribed by the other medical staff that treated Mr. Diaz both during and after the care provided by Dr. Hashimoto.

VII.  Discussion

In his opposition to the motion for summary judgment, plaintiff emphasizes that he "consistently complained about the pain and discomfort which occurred from said vehicle accident," and that, while Dr. Hashimoto noted plaintiff's complaints in his treatment notes, he failed to adequately treat plaintiff, as demonstrated by the worsening of plaintiff's symptoms. (ECF No. 40 at 2-4.)  Plaintiff asserts that Dr. Hashimoto's alleged deliberate indifference to his serious medical needs is underscored by defendant's failure to obtain a diagnostic MRI.  (Id. at 4.) Plaintiff emphasizes that he "still suffers pain in his back, neck, and shoulder area," and that his dizziness "is now categorized as vertigo."  (Id. at 3.)

The court finds that plaintiff's medical conditions and symptoms – back and neck pain with evidence of degenerative disc disease; right shoulder pain, diagnosed as tendinitis; dizziness and vertigo – are "serious medical needs" within the meaning of the Eighth Amendment. Defendant does not contend otherwise.  Any reasonable physician would find it important to investigate and treat each of these conditions, McGuckin, 974 F.2d at 1059-60, to prevent further injury or the unnecessary and wanton infliction of pain, Estelle, 429 U.S. at 104.

However, even under a liberal construction of the record in plaintiff's favor, the court finds that plaintiff has failed to submit any evidence to support the subjective component of his deliberate indifference claim, specifically, that defendant Dr. Hashimoto knew of and disregarded an excessive risk of harm to plaintiff.  "[T]the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  Farmer, 511 U.S. at 837.

As a threshold matter, plaintiff's Eighth Amendment claims against Dr. Hashimoto must be construed within the time frame of Dr. Hashimoto's treatment of plaintiff, from April 3, 2009 to August 24, 2010.  Dr. Hashimoto first treated plaintiff six months after his October 2, 2008 accident.  By then, plaintiff had received x-rays of his thoracic and lumbar spines, been examined at least four times, and was taking prescribed pain medications.  Upon examining plaintiff, Dr.

1   Hashimoto observed full range of motion in plaintiff's lumbosacral spine, negative straight leg

2   lifts, normal gait and reflexes.  Dr. Hashimoto noted that plaintiff was walking one to two laps per

3   day and that his functioning appeared "good," and instructed plaintiff on appropriate movement

4   and exercises, in addition to refilling his NSAIDs.  Dr. Hashimoto also noted plaintiff's

5   complaints of dizzy spells since his accident, and his imminent referral to a cardiac surgeon for

6   treatment of "severe" mitral valve regurgitation.

7            The second time Dr. Hashimoto treated plaintiff, on May 26, 2009, plaintiff had

8   undergone his May 6, 2009 mitral valve surgery.  Dr. Hashimoto ordered a lay-in and cell feeding

9   for one month.

10            At his third visit with Dr. Hashimoto, on June 26, 2009, plaintiff was still recovering from

11   surgery.  Dr. Hashimoto ordered a six-month accommodation chrono for a lower bunk, and

12   refilled plaintiff's post-surgical prescription for Vicodin, as well as his NSAIDs.

13            During the next fourteen months, Dr. Hashimoto examined plaintiff on a routine and

14   frequent basis, monitored his symptoms, prescribed medications, and made appropriate diagnostic

15   referrals.  There is no evidence that Dr. Hashimoto ignored any pertinent signs or symptoms

16   presented or exhibited by plaintiff.  Rather, as set forth in his treatment notes, Dr. Hashimoto

17   reviewed the reports of plaintiff's spine x-rays and ordered x-rays of plaintiff's right shoulder;

18   considered plaintiff's complaints of dizziness, pain and compromised function; examined plaintiff

19   and reevaluated his course of care accordingly.  In addition to recommending appropriate

20   stretches and exercises, and offering physical therapy, Dr. Hashimoto prescribed NSAIDs for

21   plaintiff's spinal and shoulder pain; a cortisone injection to treat plaintiff's shoulder pain; and

22   Meclizine to treat plaintiff's dizziness.

23            As set forth in detail in the declaration submitted by Dr. Heatley, MCSP Chief Medical

24   Executive, Dr. Hashimoto's treatment of plaintiff met the standard of care for each of plaintiff's

25   presenting symptoms and conditions.[7]

26   _____

27   [7]  Dr. Heatley identifies the following pertinent standards of care, and how Dr. Hashimoto's care
     of plaintiff met these standards (Heatley Decl. at ¶¶ 41-3):

28            41.  The standard of care for treatment for dizziness is to evaluate

1    Moreover, plaintiff does not identify the medical treatment he believes he should have

2

3    the patient to see if it is connected to the central nervous system or
     related to the ear.  If the examination and medical history reveals
4    that the dizziness is not neurological or life threatening then the
     proper treatment would be observation and the prescription of
5    meclizine.  Many times the condition will correct itself, but if it is
     chronic then instruction on the Epley maneuver is standard.  Based
6    on Mr. Diaz's condition in this case, Dr. Hashimoto first
     appropriately excluded life-threatening or disabling medical
7    conditions and noted that Mr. Diaz's symptoms were infrequent and
     brief.  Nothing in Mr. Diaz's medical records indicates that the
8    dizziness was actually caused by the automobile accident or
     something else.  After ruling out a life-threatening or disabling
9    cause, Dr. Hashimoto prescribed meclizine to treat the dizziness.
     Because Mr. Diaz's symptoms were infrequent and intermittent, the
10   medication did not appear to have a long-term value and was
     subsequently, and properly, discontinued.  Mr. Diaz was also
11   appropriately instructed Mr. Diaz on the Epley maneuver and gave
     other instructions on things he could manage on his own.

12

13   42. The standard of care for shoulder tendinitis is examination and
     corticosteroid injections.  Shoulder tendinitis or bursitis is a
14   common occurrence in people with arthritis, such as that
     experienced by Mr. Diaz.  Given that Mr. Diaz's shoulder pain
15   occurred at a later time, there is no medical documentation or
     opinion by a medical professional that it was actually related to the
16   alleged automobile accident. Mr. Diaz's shoulder pain had evidence
     of improvement over time and there were days that he did not
17   experience pain at all. Based on Mr. Diaz's condition in this case,
     Dr. Hashimoto appropriately prescribed local corticosteroid
18   injections to help the pain and physical therapy.

19   43. The standard of care for treating the osteoarthritis and
     degenerative joint disease exhibited by Mr. Diaz is first an
20   examination to ensure it is a degenerative condition rather than a
     fracture.  Mr. Diaz's osteoarthritis and degenerative joint disease is
21   very common condition in adults and is associated with normal
     aging and wear and tear.  There was evidence in the medical
22   records that these conditions pre-existed the automobile accident
     and that the accident may have aggravated them. Mr. Diaz's pain
23   was, however, infrequent, and it showed improvement over time.
     There was no sign that it limited his functionality in terms of daily
24   activities and he was walking daily.  The standard of care for this
     condition is use of anti-inflammatory and analgesic medications,
25   and instruction on back exercises.  Based on Mr. Diaz's condition
     in this case, Dr. Hashimoto appropriately prescribed both anti-
26   inflammatory and analgesic medications and also provided Mr.
     Diaz with instructions on back exercises.

27   There is no record evidence, or any evidence that supports a reasonable inference, that is
     inconsistent with Dr. Healtley's assessment.
28

1    received.  In his FAC, plaintiff alleges that he failed to receive "proper" medical attention and

2    treatment; that medical staff "failed to remedy my needs and continue[d] to downplay or

3    disregard my complaints;" and that defendant "rendered no helpful solutions."  (FAC at 3.)  In his

4    opposition to the pending motion, plaintiff identifies only one specific matter that he alleges Dr.

5    Hashimoto should have done, which is to obtain an MRI.  (Oppo. at 4, 29.)  However, the only

6    submitted medical request for plaintiff to obtain an MRI was denied on review, and the record

7    supports no reasonable inference that another MRI request would have been approved.  The May

8    2010 denial of the April 2010 request for an MRI of plaintiff's right shoulder, by Dr. C. Smith,

9    Chief Physician and Surgeon for the MCSP Medical Authorization Review Committee, was

10   unequivocal – it was deemed medically unnecessary, and plaintiff was referred to physical

11   therapy.

12           Even if plaintiff could identify the medical treatment he believes he should have received,

13   his argument would demonstrate no more than a difference of opinion with Dr. Hashimoto, which

14   does not support an Eighth Amendment claim.  "[A] plaintiff's showing of nothing more than 'a

15   difference of medical opinion' as to the need to pursue one course of treatment over another [is]

16   insufficient, as a matter of law, to establish deliberate indifference."  Jackson v. McIntosh, 90

17   F.3d 330, 332 (9th Cir. 1996) (citing Sanchez, 891 F.2d at 242).  To prevail on a theory that one

18   course of treatment was preferred, a plaintiff "must show that the course of treatment the doctors

19   chose was medically unacceptable under the circumstances," and "that they chose this course in

20   conscious disregard of an excessive risk to plaintiff's health."  Jackson, 90 F.3d at 332 (citations

21   omitted); see also Toguchi v. Chung, 391 F.3d 1051, 1058 (9th Cir. 2004).  Plaintiff has not made

22   this showing.

23           There is no evidence to sustain a reasonable inference that Dr. Hashimoto knew of, and

24   disregarded, a substantial risk of harm to plaintiff.  Nor is there any evidence to indicate that Dr.

25   Hashimoto at any time denied, delayed or intentionally interfered with plaintiff's medical care.

26   See Estelle, 429 U.S. at 104-5.  For these several reasons, the undersigned finds no material issue

27   of fact precluding summary judgment on behalf of defendant Hashimoto on plaintiff's Eighth

28   Amendment deliberate indifference claims.

VIII.  Remaining Matters

        In light of this court's recommendation that summary judgment be granted for defendant Dr. Hashimoto on plaintiff's Eighth Amendment claims, the court need not reach defendant's challenges to plaintiff's claims for punitive damages and equitable relief.  Nor need the court reach defendant's alternative contention that he is entitled to qualified immunity.  When the alleged facts, viewed in the light most favorable to plaintiff, do not sustain a constitutional claim, the court is not required to consider defendant's qualified immunity defense.  Saucier v. Katz, 533 U.S. 194, 201 (2001).

IX.  Conclusion

        For the reasons previously stated, IT IS HEREBY ORDERED that:

        1.  Defendant's objections to plaintiff's evidence and motion to strike (ECF No. 42) are overruled; and

        2.  Defendant's motion to strike (ECF No. 42) is denied.

        In addition, for the foregoing reasons, IT IS HEREBY RECOMMENDED that:

        1.  Defendant's motion for summary judgment (ECF No. 36) be granted;

        2.  Judgment be entered for defendant Dr. W. Hashimoto; and

        3.  This action be closed.

        These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the objections shall be filed and served within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated:  August 5, 2014

                                                KENDALL J. NEWMAN
                                                UNITED STATES MAGISTRATE JUDGE

diaz1388.msj

24